J-S22013-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| PAVEL BELOUS | : | |
| | : | |
| Appellant | : | No. 326 EDA 2026 |

Appeal from the Order Entered December 30, 2025
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0003551-2021

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| PAVEL BELOUS | : | |
| | : | |
| Appellant | : | No. 375 EDA 2026 |

Appeal from the Order Entered December 30, 2025
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0002652-2021

BEFORE: PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.: **FILED AUGUST 4, 2026**

Pavel Belous appeals from the order denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546, in which Belous raised numerous claims of ineffective assistance of plea counsel related to his entry of an open guilty plea. For the reasons discussed below, we find the PCRA court properly denied relief and therefore affirm.

On July 26, 2021, Belous was charged by criminal information at docket 2652 of 2021 with (1) robbery—threat of immediate serious bodily injury, (2) simple assault, (3) kidnapping to facilitate a felony, (4) terroristic threats, (5) theft by unlawful taking—movable property, (6) receiving stolen property, (7) possession of an instrument of a crime ("PIC"), and (8) false imprisonment.[1] This docket pertained to victim Jarred Peglow.

On August 25, 2021, Belous was charged by criminal information at docket 3551 of 2021 with two counts of criminal attempt—criminal homicide.[2] This docket again related to Peglow, as well as his Mother, Felicia Peglow ("Ms. Peglow"), who was also a victim in this matter.

The trial court summarized the facts as established and agreed to by Belous at the guilty plea hearing as follows:

> The date of the offense is March 11, 2021 . The victim in this case is Jarred Peglow. He's present in court with his mother, Felicia Peglow, [who] is also a victim on the other attempted homicide case. Essentially, [most of these facts] are derived from Peglow's written statement to police and … the police report. …
>
> [] Peglow stated that around 7:30[p.m.] on Thursday, March 11th, he left his house after doing [school work] to go to a friend's house. That friend was Nick Wiley. Nick Wiley... asked Peglow to do him a favor. He was going to pay him $15 to take him to Dina's Cafe so that [] Wiley [could] buy some beer.... [At Dina's Cafe,] [] Wiley went inside and bought some Steel Reserve beer and [brought it] back to [Peglow] 's car. While [] Wiley was inside

_____

[1] 18 Pa.C.S.A. § 3701(a)(1)(ii), 18 Pa.C.S.A. § 2701(a)(3), 18 Pa.C.S.A. § 2901(a)(2), 18 Pa.C.S.A. § 2706(a)(1), 18 Pa.C.S.A. § 3921(a), 18 Pa.C.S.A. § 3925(a), 18 Pa.C.S.A. § 907(a), 18 Pa.C.S.A. § 2903(a), respectively.

[2] 18 Pa.C.S.A. § 901(a).

Dina's Cafe, [Peglow saw] a maroon SUV and a person sitting in the driver's seat of the vehicle with a mask over his face, staring at him. He thought it was off but then didn't think too much of it....

[That person was later identified as Pavel Belous, the Defendant, who was seen moments prior] entering Dina's Cafe, [making] a purchase of, ironically, the same drink that [] Wiley purchased..., [wearing] a striped shirt, gray shorts....

[Peglow and Wiley] then left Dina's Cafe and [Peglow took] Wiley to the Glen Apartments, which are located on Street Road, Warminster, Bucks County. [] Wiley stopped there to deliver the Steel Reserve beer while [Peglow] remained in the car. While [Peglow] was in the car waiting for [] Wiley, [Peglow], again, saw the maroon SUV in the same area drive past him in the parking lot.

[Peglow] then dropped off [] Wiley at his home, which is on Miller Drive, in Southampton, Bucks County. When he did that [he], again, saw the maroon SUV pull into a driveway with its lights off. Again, [] Peglow thought it was off but didn't think too much of it and he left the area. Around 10:14p.m., [Peglow] arrived at the McDonald's located on Second Street Pike....

[] Peglow [ordered] a fish fillet, small fry and a Sprite. You can see from the video, [] Peglow clearly has his headlights on and he pays for his meal. ... [After he got his meal, he parked by a dumpster and began to eat]. While [] Peglow was in his car eating his sandwich, … [Belous] entered [Peglow's] car wearing the mask over his face. [Belous had] parked his SUV next to [Peglow's] vehicle, about two spaces over.

[Belous] entered the passenger's side of [] Peglow's vehicle and immediately put a knife up against [] Peglow's face and demanded that [] Peglow give him money. [] Peglow [only had $18 on him, and Belous] was not satisfied with it, so [] Peglow offered an additional $2 in coins....

[Belous then] threatened him in various ways. He [told] Peglow that he [was] going to slit his throat and burn his car so there [would not] be any evidence of what he did. He [told] Peglow that he [would] not hesitate to kill [him] and that [he has] killed before.

- 3 -

[] Peglow [took] this seriously and [observed] what looked like to be dried blood on [Belous]'s hands. … [Belous] then ordered [] Peglow to drive from the McDonald's to an ATM machine to get him more money. … They went to the Wawa, which is located at 10 Davisville Road, Warminster, Bucks County.... [Belous told Peglow it was too busy, and made him drive to] a different location; an isolated ATM where there were not so many people. … [The second] ATM is right across the street from [Wawa]. It's a PNC Bank. …

[Belous then] made [] Peglow, at knife point, go to the ATM. [They both] entered the PNC. [Belous] reapplied his mask. Just prior, [Belous] told [] Peglow [that because he saw him without a mask, Belous] had to kill [Peglow] so he could not identify [him]. [Belous] threatened that, based on the blood on his hand, the knife in [Peglow' s face and neck, Belous knew Peglow could identify him and said,] 'I'm going to kill you.'

[At the ATM,] Peglow used his ATM card, and [Belous told] him to clear out his bank account. At the time, [] Peglow had $477 in his bank account that he earned working full time while he attended school. The entire time, [Belous] watched him, his movements, and what he was doing... When [Peglow] took the money from the machine, [Belous told] him, 'Don't hand it to me because we're on camera. Put it in your pocket and give it to me once we're off camera outside.' The two then left the ATM, [at] PNC. …

[Belous was] still not satisfied. He still wanted more. He [told] Peglow, 'I know you got more money at your house. You may have gold or something at your house. I want you to take me to your house.'

[However, prior to making Peglow drive home, Belous] initially told him to go back to McDonald's. They drove back to the McDonald's ... and they were there between, approximately, 10:31p.m. and 10:53p.m., [sitting in the parking lot,] and [Belous] just [went] on and on about how he intended to kill him, how he intended to take him back to his house and ... to rape [Peglow's] mother. [Belous said he was] going to cut her face off, slit her throat, and kill her after he kills him, then he was going to set their family home on fire and destroy the evidence so he couldn't be tracked. …

[Peglow tried] to bargain with [Belous] and [offered to give him his coin collection he had at home]. [Belous] said 'okay,' so they went from McDonald's to the Peglow residence. Prior to arrival, [Peglow attempted to dial 911] but it was a drop call. [However,] it alerted law enforcement [that something was amiss]. … [Peglow] then told [Belous], 'Look, I'm not allowed to bring friends home. I have to tell my mom that I'm bringing somebody home.' [Belous let Peglow call her, but said,] 'put it on speaker phone and don't tip her off about anything.'

[Peglow made the call as he entered] the neighborhood. [Ms. Peglow thought] there was something [wrong because] it was night, [Peglow] was in school and did not [normally] bring people home like that. She thought it was odd. So, Ms. Peglow went out onto the front porch of her house … and [had] a cigarette while waiting for her son to arrive.

Peglow pulled up to the residence but did not pull up to where he normally parks, but pulled up across the street. … [Belous got out of the car and wanted Peglow] to leave the car on. [Peglow told Belous] that his car is [on its last leg] and would die. … He asked permission to turn the car off and get the keys. As [Peglow went] back to the car, [he] grabbed his boy scout knife … from the center console of his vehicle.

As [Belous] ran towards [Ms. Peglow], who was on the porch, [Peglow] stabbed [Belous] in the back. [Belous fell] down and [Peglow] ran to his mother, grabbed her, and forced her in the house. She didn't know what was going on.… [Peglow] immediately locked the door and called 911.

[Peglow told] 911 exactly what happened, that he was robbed and he was forced to go to his home. The person was going to kill him, that he stabbed somebody and that person was in the driveway. …

[Meanwhile, Belous dragged] himself back to [Peglow's] car because he believed that they keys were still in there and put himself in the driver's side of the vehicle.

Police [arrived] within a few minutes [and found Belous in Peglow's vehicle]. He was honking the horn [and was] obnoxious to the police on site[;] … he [also] told the police on scene and then at the hospital that he was the victim. He said he was

kidnapped, he said that he was robbed, he said that [] Peglow intended to kill him. … [Belous] started a ruse from the time he was stabbed up until [just before the guilty plea].

Trial Court Opinion, 2/12/26, 1-5 (some brackets changed) (citation omitted).[3]

On March 25, 2022, at a hearing, the Commonwealth noted it anticipated an open guilty plea was to be entered that day. *See* N.T., 3/25/22, at 4. Plea counsel confirmed that was correct. *See id.* As part of the plea, the Commonwealth agreed to *nol pros* the counts for receiving stolen property and false imprisonment. *See id.*

Belous was then administered the oath so that he could testify. *See id.* at 5. The Commonwealth explained that the terms of the guilty plea had been negotiated, clarifying as follows:

[Belous], due to his prior convictions, should he had been convicted by jury trial in this matter would be subject to a third strike which is 25 years to life *on each of any* of the first four counts; meaning, the two attempted homicides, the robbery and the kidnapping.

The Commonwealth has agreed to not request a third strike with regard to a conviction on those matters. Instead, seeking an open guilty plea as to the guidelines as to each matter.

_____

[3] While the trial court block quotes from the guilty plea hearing transcript, we note that the court took some liberties with the quotation. However, the changes are mainly grammatical; for example, changes to the tense of words, pronouns or names used, or a simplified version of a longer sentence. The substance of the factual summary otherwise remains the same.

*Id.* at 5-6 (emphasis added). Plea counsel affirmed that was Belous's understanding of the plea negotiation. *See id.* at 6.

The court explained to Belous that he was entering a plea to two criminal informations. *See id.* at 7. The court stated that on docket 3551 of 2021, Belous was charged with two counts of criminal attempt at homicide which carried a maximum penalty of 20 years' incarceration each, for a total of up to 40 years in jail. *See id.* at 7, 8-9. Belous affirmed he understood the maximum penalty on those charges. *See id.* at 9. The court then thoroughly explained the elements of criminal attempt at homicide and Belous affirmed his understanding of the charge and its elements. *See id.* at 9-11.

Next, the court stated that on docket 2652 of 2021, Belous was charged with robbery and kidnapping, which "each carry the same maximum penalty up to 20 years in jail," and "could be run consecutively and not concurrent with the attempted murder. So you're looking at another—up to 40 years in jail …." *Id.* at 11. The court defined the charges of robbery and kidnapping, and Belous affirmed his understanding of those charges. *See id.* at 11-12.

The court continued explaining the remainder of the charges, including that Belous could be sentenced up to 2 years' imprisonment for simple assault, and up to 5 years' imprisonment each for terroristic threats, theft, and PIC. *See id.* at 12-13. The court thoroughly explained the elements of each of those charges. *See id.* at 12-14. Belous affirmed his understanding of each maximum sentence and the elements of each charge. *See id.*

- 7 -

The court then summarized, "if my math is correct you're facing a maximum penalty of 97 years in jail if everything was to be run consecutively …." *Id.* at 14. Belous affirmed he understood the aggregate maximum sentence. *See id.* The court clarified that the sentences for simple assault and theft could possibly merge, but that in any event "[i]t would be a significant period of incarceration as we discussed." *Id.*

The court then continued with the plea colloquy. Belous affirmed that he understood that he did not have to plead guilty, and that he could have a jury trial where he would be presumed innocent and the Commonwealth would have the burden to prove him guilty. *See id.* at 15-16, 17-18. Belous affirmed he understood that by giving up his right to a trial, he was giving up the right to confront and cross-examine witnesses, and the right to litigate pretrial motions. *See id.* at 16-17. Belous further affirmed he understood his limited appeal rights. *See id.* at 17. Belous confirmed he had enough time to discuss the matter with his lawyer, review the discovery, evidence, and charges in the case, and was satisfied with the advice he received at that point. *See id.* at 18-19. Belous affirmed he had not been threatened or forced to plead guilty and was entering the plea voluntarily and of his own free will. *See id.* at 19.

Plea counsel then placed the written plea colloquy in front of Belous. *See id.* at 19-20. Belous affirmed that he recognized the document, had gone over every paragraph of the document with counsel, had answered each paragraph correctly and honestly, that his answers would be the same if

counsel were to ask the same questions under oath in court, and that he recognized the initials at the bottom of each page, as well as his signature on the last page, as his own his initials and signature that he had placed there himself to signify that he agreed everything in the document was true and correct. *See id.* at 20-21. Belous further affirmed that counsel had reviewed each question with him, and had answered any questions Belous had about the document. *See id.* at 21.

Belous affirmed that counsel had reviewed all of the facts of the case with him, and that they discussed the pros and cons of going to trial and accepting a plea. *See id.* Belous again confirmed that no one was forcing, threatening or coercing him to enter into the plea agreement, that he was doing so after consultation with counsel, and that he did not, as he sat there in court, have any questions for counsel, the court, or the Commonwealth. *See id.* at 22.

The Commonwealth subsequently read the extensive facts into the record, as summarized above, entering numerous exhibits into evidence, including the police report, video surveillance, the 911 calls, maps, photographs, and receipts. *See id.* at 24-45. Belous affirmed the facts as stated were substantially correct. *See id.* at 45. Belous did not enter any evidence of his own. Sentencing was deferred for preparation of a presentence investigation report ("PSI").

On November 9, 2022, the parties appeared for sentencing. The Commonwealth noted it did not have too much additional information to provide in addition to the lengthy factual recitation provided at the time of the guilty plea, the multiple exhibits provided, and the PSI, which the Commonwealth described as "among the best I've seen in terms of depth as well as [Belous]'s prior criminal history." N.T., 11/9/22, at 4.

The court then provided Belous with the sentencing guideline ranges for each of the crimes to which he had entered a plea. *See id.* at 5-6. Belous affirmed his understanding of the ranges. *See id.* After Belous was sworn in, he again affirmed his understanding of the sentencing guidelines as they were explained to him. *See id.* at 6-7.

Peglow and Ms. Peglow, who had completed victim impact statements in advance of the sentencing hearing, both testified at the sentencing hearing to provide additional statements regarding the extensive impact of this matter on their lives. *See id.* at 7-18.

Plea counsel then argued that a sentence at the bottom of the guidelines was appropriate, noting Belous's acceptance of responsibility, remorse, family support (his brother, father, and mother were in attendance at the sentencing hearing), and mitigating evidence (including the tragic loss of three of his brothers). *See id.* at 19-23. Plea counsel therefore asked for a sentence of 10 years' incarceration, with a long tail end, around 30 or 40 years, so that the parole board could determine when to release him based on what he does in

prison. **See id.** at 23-24. Belous then allocated, apologizing for his actions and expressing that he was now sober and realized what he did was wrong. **See id.** at 27-29.

After the Commonwealth argued that an appropriate sentence of total confinement was necessary, the court noted for Belous that it had to take into consideration a number of factors when imposing a sentence. The court explained its consideration of the "horrifying" facts of the case, including the premeditated and deliberate nature of the crimes, the "thorough and comprehensive" PSI, and the victims' statements. **See id.** at 38-39. The court noted its consideration of Belous's nature and character, including his family support, and the loss of his three brothers. **See id.** at 40. The court noted the irony that one brother was lost to a homicide, so Belous knows "the pain … of losing a family member prematurely and unexpectedly to a violent act." **Id.** The court also noted Belous's criminal history, which included juvenile as well as adult convictions, and a documented history of being provided numerous programs, and still violating supervision and reoffending. **See id.** at 40-41.

The court reviewed the sentencing guidelines, noting they recommend ten years' imprisonment on four of the offenses, and that the PSI recommended that those sentences be run consecutively for a total of 40 to 80 years' incarceration. **See id.** at 41-42.

The court emphasized the "immeasurable" impact on the young victim. **See id.** at 42. The court acknowledged Belous's apology, and noted that it

found Belous to be sincere. *See id.* at 43-44. However, the court also considered the need to protect the community, and that Belous's actions involved "a particular level of cruelty, mental cruelty" when he "mentally tortured" the young victim by continuously telling him what was going to happen to him and that he, and his family members, would be subjected to a night of violence. *See id.* at 44-45. The court referenced a particular point in the PSI, which found that "[Belous]'s homicidal behavior was likely only prevented due to [] Peglow's quick thinking and courage during an extremely dangerous situation." *Id.* at 45.

Finally, the court noted its last consideration was the need for rehabilitation. The court highlighted that numerous forms of rehabilitation had been implemented on Belous's behalf previously, and that none of them had resulted in significant success. The court acknowledged counsel's indication that Belous had been victimized and was vulnerable in prison, given that he was left paralyzed and wheelchair-bound from this incident, and agreed that Belous should be in a place where he's safe. *See id.* at 47. However, based on all of the considerations, the court found a sentence of total incarceration was appropriate. *See id.* at 48. The court therefore sentenced Belous to consecutive terms of 10 to 20 years' incarceration for robbery, kidnapping, and both counts of criminal attempt homicide. *See id.* at 48-49. Accordingly, the aggregate sentence imposed was 40 to 80 years' imprisonment. Belous

filed a timely post-sentence motion for reconsideration of sentence, which the court denied.

After his appellate rights were reinstated *nunc pro tunc*, this Court affirmed the judgment of sentence on direct appeal. ***See Commonwealth v. Belous***, 301 EDA 2023, 302 EDA 2023 (Pa. Super. filed April 8, 2024) (unpublished memorandum) (re-argument denied).

On July 11, 2025, Belous filed the instant PCRA petition, asserting plea counsel had provided ineffective assistance. After the Commonwealth filed a motion to dismiss the petition, a PCRA hearing was scheduled.

On August 22, 2025, an evidentiary hearing was held. Belous testified that when he went into the guilty plea proceeding, he was under the impression that there would be a sentence that would not have a minimum component longer than 25 years. ***See*** N.T., 8/22/25, at 7. Belous testified that he held that belief because plea counsel had told him, "no more than 25 years." ***Id.*** Belous testified that he always thought he was going to get a guilty plea, and had discussed a guilty plea with plea counsel. ***See id.*** at 8-9. Belous asserted that his understanding of the outcome of pleading guilty was that the worst sentence would be 25 years. ***See id.*** at 9 ("That's the way I understood it. I asked [plea counsel] that. That's what he told me so I went along with it. I said, that's the worst, 25 years, so I thought I might get a lower number, maybe get some kind of offer.").

Belous claimed he had not seen a copy of the discovery in the case, and did not recall discussing his trial rights either at the guilty plea hearing, or prior to the hearing with plea counsel. *See id.* Belous claimed that he did not understand what an open plea was, know what evidence the Commonwealth had to present at a trial, or have any conversations with plea counsel about possible defenses. *See id.* at 10. Belous asserted he did not understand the term "mitigating evidence" and did not know anything about the sentencing guidelines prior to the guilty plea hearing. *See id.* at 10-11 ("I don't know what they are. I don't even know what scale I'm at or anything. I have no idea"). Belous stated the sentencing guidelines were not reviewed with him prior to the guilty plea hearing, and the only maximum sentences he understood was "25 years." *Id.* at 11.

When asked what Belous thought the court needed to know with respect to his representation prior to and at the guilty plea and sentencing, Belous's response largely involved his troubles from his medical and physical condition. *See id.* at 12-13. Belous focused on how he wished there was more discussion about his paralysis and need for hernia surgery before and at sentencing. *See id.* Only towards the end of his explanation did Belous assert, "I had nothing explained to me, no evidence, one on one. What does that mean? What could happen? What would not happen? Nothing. I didn't know it was going to turn out this way." *Id.* at 13. Belous ended by reiterating his apology, and asking for a second chance. *See id.* at 13-14.

On cross examination, Belous confirmed that plea counsel was currently representing him on pending charges in Philadelphia. *See id.* at 16. When asked to clarify why plea counsel was still representing him in another case even with the asserted issues with his representation here, Belous simple stated, "[w]ell, this case, I don't know what happened to this case." *Id.*

The Commonwealth provided Belous with a copy of his written plea colloquy, as well as the guilty plea transcript, and Belous admitted that he had affirmed his understanding of the charges, the maximum sentence, and his rights, at that time. *See id.* at 19-25; *contra, id.* at 25 (acknowledging he had responded positively to the questions but asserting "Yeah, but I don't understand everything."). Belous asserted he "was saying yes, yes, yes, because [plea counsel] wanted me to go yes, yes, yes and [I was] waiting for my sentence." *Id.* at 25. Belous acknowledged that he has a lengthy prior record, has been to prison before, has put in multiple guilty pleas, and been sentenced multiple times before, but argued "I've been explained it the right way and stuff [previously]." *Id.* at 26-27. When asked why he did not say anything when the court explained his maximum sentence could be up to 97 years' incarceration, Belous only explained that he relied on his lawyer because he did not know the law. *See id.* at 27.

Plea counsel then testified. Plea counsel affirmed he continued to represent Belous in Philadelphia in a different matter. *See id.* at 34. Plea counsel explained that Belous "was a third striker. He'd had two prior felony

convictions for crimes of violence. So, you know, when—a lot of our discussions were around the 25-year minimum mandatory that he would have if he was convicted." *Id.* Plea counsel explained the 25-year minimum mandatory that would apply at trial was a big concern for them, so they had a lot of discussions about it. *See id.* at 35. However, counsel was able to secure a plea deal for Belous, which was an open plea with no mandatory, so Belous would not be facing the 25-year minimum mandatory. *See id.* Plea counsel discussed this negotiated plea with Belous. *See id.* On cross-examination, counsel clarified that the 25-year mandatory, that was of concern, was on four separate counts—robbery, kidnapping, and two counts of attempted homicide, so "technically, [the court] could have—if he went to trial he could have gotten four 25-year mandatories …." *Id.* at 41.

Plea counsel stated that Belous's concern, like any defendant, was what sentence he was going to get. *See id.* at 36. So, they had discussions about what sentence he could get, the guidelines, and possible mitigation evidence. *See id.* Belous had a number he was hoping to get, which counsel believed was 15 years, but they had not been able to secure that in a plea deal. *See id.* Plea counsel explained to Belous that in pleading guilty, he could accept responsibility, which would go a long way with the court since the victim would not have to testify. Plea counsel explained they would need to put together some mitigation evidence to see what sentence they could possibly get, but that he did not think 15 years was impossible, even though that is not how it

ended up. *See id.* Regarding mitigation, counsel wanted to get Belous evaluated by a doctor, but ultimately did not end up having the doctor testify or write a report because after discussions with the doctor, they did not feel the doctor would be helpful to the case, which counsel discussed with Belous. *See id.* at 36-37. On cross examination, counsel clarified that he "was looking for some sort of diagnosis or something that we could have used to explain [Belous's] behavior, which would have helped mitigate with the [c]ourt." *Id.* at 40. However, after hiring the doctor, "he could not find anything that we felt was significant at all that would influence [the court] to lower the sentence." *Id.*

Plea counsel explained this was a difficult case, as far as potential defenses, because there were challenges with overcoming Belous's initial statement to police at the scene that he was the victim. *See id.* at 37. Regarding a defense that presented Belous as the victim, counsel was sure his office had provided Belous with paper copies of discovery. *See id.* at 37-38. While the videos could not be sent to Belous, they had watched the videos together, and the videos had been played at the preliminary hearing. *See id.* at 38.

Plea counsel recalled going over the written guilty plea colloquy with Belous. *See id.* Plea counsel clarified that he filled out Belous's name, the docket numbers, and dates, and went over every question with Belous before Belous signed his initials and name on the document. *See id.* at 39.

Plea counsel explained that while he did not have trouble communicating with Belous, that Belous focused on certain things and it was sometimes hard to refocus him, which counsel found to be true with a lot of clients. *See id.* at 41-42. If Belous struggled with understanding something, counsel would go over it again, as best he could, until he understood. *See id.* at 42.

Plea counsel represented Belous on direct appeal and therefore spoke to Belous after the guilty plea and sentencing. *See id.* at 43. When asked if Belous had asserted he did not get what he was promised, plea counsel stated:

> There was a what happened, absolutely. There was a what happened moment. It was immediately afterwards and then subsequent conversations. There was definitely a what happened moment. But it wasn't what happened, that wasn't what I was promised. Yeah, I was shocked. I thought I could do better for [Belous]. I wish I had.

*Id.* Counsel explained that they talked about goals, what they wanted to shoot for, and what was reasonable, but there was never a promise of any particular sentence. *See id.* at 44. Following the hearing, the parties submitted memorandum in support of their positions. The court subsequently entered an order denying the PCRA petition. This timely appeal followed.

Belous raises the following issue on appeal:

> Did the trial court err in denying post-conviction relief with respect to [Belous]'s claim that he received ineffective assistance of counsel in the guilty plea proceedings where [Belous] believed he would receive no more than twenty-five (25) years as a minimum sentence, trial counsel failed to properly discuss with [Belous] his options regarding trial vs. guilty plea, failed to discuss the evidence against [Belous] and potential defense evidence, failed to properly investigate the case to determine whether any defenses were available and viable, failed to explain the

- 18 -

sentencing guidelines and maximum sentences to [Belous], all of which led to a guilty plea, that was not knowing, intelligent, and voluntary?

Appellant's Brief, at vi.

Our review of an order denying a PCRA petition is limited to examining whether the PCRA court's determinations are supported by the record and the court's decision is free of legal error. *See **Commonwealth v. Shaw***, 217 A.3d 265, 269 (Pa. Super. 2019). Although we give great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record, we apply a *de novo* standard of review to the PCRA court's legal conclusions. *See **Commonwealth v. Benner***, 147 A.3d 915, 919 (Pa. Super. 2016).

"A plea of guilty effectively waives all nonjurisdictional defects and defenses." ***Commonwealth v. Hudson***, 156 A.3d 1194, 1197 (Pa. Super. 2017) (citation omitted). Here, Belous failed to raise a challenge to his guilty plea at any time before the trial court. Belous did not move to withdraw his plea either. He also did not raise a claim challenging his plea on direct appeal. Therefore, any challenge to his guilty plea is undoubtedly waived. ***See*** 42 Pa.C.S.A. § 9544(b).

Seemingly recognizing this, Belous phrases his current challenge as a claim that plea counsel was ineffective regarding his representation during the plea proceedings. Specifically, Belous claims plea counsel was ineffective for advising him to plead guilty when Belous believed he would receive no more

- 19 -

than 25 years as a minimum sentence. Belous claims his plea was not knowingly, intelligently, and voluntarily entered because of ineffective assistance of plea counsel.

"A criminal defendant has the right to effective counsel during a plea process as well as during trial." *Commonwealth v. Rathfon*, 899 A.2d 365, 369 (Pa. Super. 2006) (citation omitted). However, "[a]llegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused the defendant to enter an involuntary or unknowing plea." *Commonwealth v. Hickman*, 799 A.2d 136, 141 (Pa. Super. 2002) (citation omitted). Also, "[w]here the defendant enters his plea on the advice of counsel, the voluntariness of the plea depends upon whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Id.* (quotation marks and citations omitted).

We presume counsel is effective, and an appellant bears the burden to prove otherwise. *See Commonwealth v. Bennett*, 57 A.3d 1185, 1195 (Pa. 2012). The test for ineffective assistance of counsel is the same under both the Federal and Pennsylvania Constitutions. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Commonwealth v. Kimball*, 724 A.2d 326, 330-332 (Pa. 1999). An appellant must demonstrate: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the

outcome of the proceedings would have been different. *See Commonwealth v. Solano*, 129 A.3d 1156, 1162-63 (Pa. 2015). A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. *See id*. at 1163. Where, as here, the appellant pleaded guilty, in order to satisfy the prejudice requirement, he must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Rathfon*, 899 A.2d at 370 (citation omitted).

In assessing the voluntariness of a guilty plea, we note "[t]he law does not require that appellant be pleased with the outcome of his decision to enter a plea of guilty: All that is required is that [appellant's] decision to plead guilty be knowingly, voluntarily and intelligently made." *Commonwealth v. Yager*, 685 A.2d 1000, 1004 (Pa. Super. 1996) (*en banc*) (citation and internal quotation marks omitted). "A person who elects to plead guilty is bound by the statements he makes in open court while under oath and he may not later assert grounds for withdrawing the plea which contradict the statements he made at his colloquy." *Commonwealth v. Pollard*, 832 A.2d 517, 523 (Pa. Super. 2003) (citation omitted).

Considering the totality of the circumstances, the record conclusively reflects that Belous voluntarily, knowingly, and intelligently tendered his guilty plea. *See Commonwealth v. Jabbie*, 200 A.3d 500, 506 (Pa. Super. 2018) (stating that a defendant is bound by his statements at his plea colloquy and

may not assert grounds for withdrawing the plea that contradict statements made when he entered the plea).

On appeal, Belous argues he did not understand what he was doing when he pled guilty, and had no knowledge of what was occurring. *See* Appellant's Brief, at 18. He asserts he "went into the plea hearing thinking that at worst he would receive a sentence of twenty-five years." *See id.* However, Belous does not connect this belief to counsel in any way. Belous also feigns a wide-ranging ignorance surrounding his plea; including that he never saw discovery, did not know what mitigating evidence was, did not understand his trial rights, the relevant guideline ranges, or the maximum sentences applicable to his charges. *See id.* at 19.

Belous argues: "The most logical conclusion that can be drawn by Belous' testimony is that he understood the basics of the charges against him, and in consultation with [plea] counsel he believed that he was going to receive a 25-year sentence." *See id.* at 20. We disagree. Belous completely ignores the entire oral plea colloquy that occurred here, which quite frankly, to the credit of the trial court, is one of the most in depth, and all-encompassing colloquies we have seen. The colloquy included not just a "general" overview of each of the charges Belous was facing; the court also explained each charge in a specific manner to the facts here. *See i.e.* N.T., 3/25/22, at 14 ("Possessing an instrument of a crime means that you

possessed an instrument of crime. In other words, an item -- in this case a knife that you intended to use in some criminal manner.").

The factual basis itself spanned pages of the transcript. *See id.* at 24-45. Aside from the court stating the maximum possible sentences, separately, and in the aggregate, at the plea hearing, the court also stated the guideline ranges at the sentencing hearing. *See* N.T., 11/9/22, at 5-7. Belous affirmed his understanding each time, without any questions or objections.

At no time did Belous allege he was without the necessary information needed to enter a knowing plea. Belous cannot now baldly recant his representations made under oath to the court at the time of his plea, *see Pollard*, 832 A.2d at 523.

Further, Belous has presented no evidence to support his claim that plea counsel made a promise as to his minimum sentence in exchange for his plea. Rather, this claim is belied by the record. The Commonwealth stated on the record at the plea hearing that Belous would be entering an open plea. *See* N.T., 3/25/22, at 4. The court stated the maximum allowable sentence for each offense, and in the aggregate, and Belous acknowledged his understanding of the maximum sentences. *See id.* at 7-14. Belous completed a written guilty plea colloquy form in which he affirmed that no one had promised him anything in exchange for his plea. *See* Written Guilty Plea Colloquy, 3/25/22, at 6.

Belous himself concedes he believed "based on his prior experience in the criminal justice system, that he was going to receive a plea offer to 25-years, and he was stunned when he was sentenced to a minimum of 40-years." Appellant's Brief, at 20-21. This "belief" cannot be placed on plea counsel. When asked if Belous had asserted he did not get what he was promised, plea counsel stated that they definitely shared a "what happened moment," but in the sense that they were both shocked by the outcome, not because a promise had been broken. N.T., 8/22/25, at 43. Counsel was adamant that he never told Belous he would receive a particular sentence. **See id.** at 44 ("No. We talked about goals. We talked about what we wanted to shoot for. We talked about, here's the goal, here's what's reasonable but, no, there was never a promise of sentence, no.").

As far as we can discern, granting Belous a level of credibility that is not supported by the certified record, Belous's argument is that he held a certain personal belief about his sentence, and is now disappointed by the outcome. This is not a basis to find counsel was ineffective in advising Belous to plead guilty. It is clear from counsel's testimony that he went over the case and possible sentences with Belous and investigated possible defenses, despite finding a defense difficult due to Belous's actions at the scene. Further, it is clear from the record that Belous was continuously informed about the possible sentences here. The trial court was explicit in explaining the terms of

the plea and the maximum and guideline sentences, at the plea hearing and again at the sentencing hearing.

Given this record, Belous cannot now claim his decision to plead guilty was based on plea counsel's promises or lack of explanation. *See Pollard*, 832 A.2d at 523. Accordingly, we conclude Belous's claims of ineffective assistance of counsel related to entering his plea lack arguable merit.

As Belous is not due any relief on claims that plea counsel provided ineffective assistance, we affirm the PCRA court's order denying his PCRA petition.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/4/2026